IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Paula Sturgeon, | : | |
| | : | Case No. 1:10-cv-318 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING MOTION |
| Southern Ohio Medical Center, | : | FOR SUMMARY JUDGMENT |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 12).

Plaintiff Paula Sturgeon has sued her former employer, Defendant Southern Ohio Medical

Center ("SOMC"), alleging that SOMC discriminated against her on the basis of her age, her

perceived disability, her husband's disability, and to retaliate against or interfere with her taking

medical leaves of absence.  SOMC now moves for summary judgment on all claims against it.

For the reasons that follow, the Court will **GRANT** SOMC's motion.

I.    **BACKGROUND**

The following facts are derived, except where otherwise specifically noted, from

SOMC's Statement of Undisputed Material Facts (doc. 12-6) and Sturgeon's Response (doc. 30-

3) thereto.

A.    **Hiring and Transfer to Surgery Department**

Sturgeon was employed by SOMC as a registered nurse ("RN") from July 8, 2002 until

May 10, 2008.  At the time of the relevant events, Sturgeon was fifty-one (51) years of age.

Sturgeon's nursing qualifications and job performance are not at issue in this case, except to the

limited extent noted below.

1

From 2002 until late July 2007, Sturgeon worked on a medical unit at SOMC identified as 1 West.  On June 15, 2007, Sturgeon was awarded a transfer from 1 West to the Surgery Department.  Sturgeon's transfer was delayed by her obligation to give a four-week transfer notice to her nurse manager and by her use of Family and Medical Leave Act ("FMLA") leave from June 15 through July 23, 2007.

Sturgeon began orientation in the Surgery Department in late July 2007.  Sturgeon then took FMLA leave from December 3, 2007 through January 30, 2008.  Upon her return, Sturgeon resumed orientation in the Surgery Department, but had to repeat some aspects of her orientation.  Sturgeon contends that at least some of the delays in her orientation training were caused by factors outside of her control, such as two of her trainers also requiring medical leaves of absence.  (Sturgeon Dep. 26–35; Greene Dep. 34–35.)

**B.      Request for Transfer and Resignation**

On February 27, 2008, Sturgeon applied to transfer to a case manager RN position.  This vacancy was eventually cancelled.  Sturgeon testified that it was her intent at that time to transfer to a position in a different department at SOMC.  (Sturgeon Dep. 70.)  She had been diagnosed with high blood pressure and her doctor suggested that she work in a position which required fewer hours.  (*Id.* at 40, 70.)  The surgical RN position in which she began working in July 2007 required her to work at least forty hours per week and sometimes more.  (*Id.* at 31, 40.)  Sturgeon was hoping to find a full-time position that required three twelve-hour shifts per week.  (*Id.* at 68.)

Around this time period, and before April 10, 2008, Sturgeon discussed with Jerry Klaiber, the nurse manager for surgery and her direct supervisor, that she wanted to transfer

2

positions within the hospital.  (Klaiber Dep. 11, 33–36.)

On April 10, 2008, Sturgeon notified Tom Greene, the director of surgical services, that she wished to leave her surgery position.  She told Greene that she needed to care for her husband who had been diagnosed with multiple sclerosis and cancer.  She also stated that she was having difficulty controlling her high blood pressure.  (Sturgeon Dep. 64–65.)

When talking to Greene, Sturgeon presented to him a resignation letter.  (*Id.* at 55 & Ex. 3.)  Sturgeon stated in the letter as follows:

> Dear Tom,
>
> Please accept this letter as notification that I am resigning from my full time surgery position effective 4 weeks from today.
>
> I appreciate the opportunities you have provided me during my time in the department.
>
> Sincerely,
>
> Paula Sturgeon, R.N.

(Sturgeon Dep. 55 & Ex. 3.)  Employees who resign their positions no longer have jobs at SOMC.  Based on the letter, Sturgeon's last day of employment was set for May 9, 2008.

Sturgeon testified that she believed that she had to resign her surgical position in order to transfer positions within the hospital.  (Sturgeon Dep. 56–61).  Sturgeon testified that she had been told in mid-2007 when she transferred positions from 1 West to the Surgical Department that she had to resign one position before she could accept a transfer to another.  (Sturgeon Dep. 56–57.)  Sturgeon acknowledged that she already had been offered the surgical position in 2007 when she was told that she had to resign her then-current position in 1 West.  (*Id.* at 57.)  Sturgeon had not been offered a transfer position on April 10, 2008 when she presented her

3

resignation letter to Greene.  (*Id.* at 57–58.)  Sturgeon conceded that she was not aware of any other employee being required to resign one position before seeking a transfer to another position.  (Sturgeon Dep. 59–61.)

Greene did not accept the resignation letter on April 10, 2008.  (Greene Dep. 27, 63.) Rather, he told Sturgeon to think over the decision and to speak to Jill Preston, the nurse recruiter for SOMC, to explore other positions within the hospital.  (Sturgeon Dep. 65–66.) Sturgeon re-submitted her resignation letter to Greene sometime during the week following April 10.  (Klaiber Dep. 36 & Ex. 6; Greene Dep. 73.)

**C.    Applications for Transfer Positions**

Sturgeon applied to transfer to multiple positions within SOMC before her resignation took effect.  Sturgeon told Greene on April 10, 2008 when she first presented her resignation letter that she was looking to transfer within the hospital and was willing to accept a flex position.  (Sturgeon Dep. 58–59; Greene Dep. 33.)  Employees in an RN flex position work on an "as needed" basis, receive no benefits, and are paid at a slightly higher salary rate to offset the lack of benefits.  Preston stated in her Affidavit that when an RN flex position becomes available in a department, the RNs in that department are given priority for the position.  (Preston Aff., Doc. 12-3 at 3; *see also* Eldridge Dep. 56–57; Klaiber Dep. 48.)  If the position is not filled in that manner, it is posted the same as any position.  (Preston Aff., Doc. 12-3 at 3.)

Sturgeon testified that Greene told her that the RN flex position would require her to work on-call hours.  (Sturgeon Dep. 58–59; Greene Dep. 33.)  However, the only person to hold the RN flex position in the Surgery Department was not required to work on-call hours.  (Klaiber Dep. 46.)  Sturgeon would not have been qualified for a flex position in the Surgery Department

4

without completing her orientation. (*Id.* at 45.) In any event, Sturgeon offers no evidence that the flex position in the Surgery Department was available when she resigned.

Sturgeon also applied for a position as the breast health navigator in the Cancer Center at SOMC on or about April 10, 2008. SOMC records indicate that Sturgeon gave a late bid for the breast health navigator position. (Preston Aff., Doc. 12-3 at 2, 6–7.) SOMC posts vacant positions for five days. Employees who are qualified for the position, have no active disciplinary actions, and who apply within the five-day period, have their applications sent to the hiring manager.[1] Employees who are qualified for the vacant position and who have no active disciplinary warnings, but who apply outside the five-day posting period, are considered to be "late bids." Employees who submit late bids are only considered for the position if it is not filled by an applicant who submitted a timely bid.

Sturgeon denies that she submitted a late bid for the breast health navigator position in her brief, but she admitted she was a late bidder in her deposition. (Sturgeon Dep. 85–86.) Preston contacted the hiring manager about Sturgeon's interest in this position, despite her late bid. The manager stated that she would consider Sturgeon, but only if the position was not awarded to a timely bidder. The position was awarded to an employee who had submitted a timely bid.

---

[1] Sturgeon denied this proposed fact but only to the extent that it created an inference that Sturgeon applied late for some positions. She did not properly support this denial. This Court's Standing Order Governing Civil Motions for Summary Judgment ("Standing Order") requires the non-moving party to admit or deny each fact proposed by the moving party and to provide a citation to evidence supporting each denial. (Standing Order ¶¶ (A)(2) and (3).) Further, facts are deemed admitted unless specifically denied. (*Id.* ¶ (A)(1).) The Court accepts this proposed fact, and other proposed facts to which Sturgeon does not provide a well-supported denial, as true, pursuant to the Standing Order.

On April 16, 2008, Sturgeon applied for a patient representative position, which required an LPN certification and which paid less than positions requiring an RN certification.  Sturgeon testified that she would have continued looking for an RN position if she had been awarded the patient representative position.  (*Id.* at 84.)

On April 18, 2008, Sturgeon bid for an RN position in pediatrics.  Again, SOMC records indicate that Sturgeon bid late on this position.  (Preston Aff., Doc. 12-3 at 1–2, 8.)  At her deposition, Sturgeon stated that she was a punctual person and did not believe her application was late, but she provides no factual basis for her understanding.  (Sturgeon Dep. 85.)

On April 20, 2008, Sturgeon applied for a workforce development educator position. (Preston Aff., Doc. 12-3 at 2; Sturgeon Dep. 87–88.)  The position required a background in education.  (Sturgeon Dep. 87.)  Sturgeon stated that her degree was in nursing, but that she had taken college-level classes in education, was "able to teach health in public schools," and worked as a nurse educator at Mercy Hospital.  (*Id.* at 87–88.)  SOMC hired an outside candidate with university experience and a Master's degree in education for this position.

Also on April 20, 2008, Sturgeon applied for an RN flex position in the Emergency Department.  Sturgeon was interviewed for the RN flex position, but it was awarded to an employee with experience in the Emergency Department.

On April 22, 2008, Sturgeon submitted a late bid for an RN position back on 1 West. SOMC records indicate that the job had been posted on April 10, 2008.  (Preston Aff., Doc. 12-3 at 2, 8.)  Again, Sturgeon testified in her deposition that she did not think that her bid was late, but she provides no factual basis for her understanding.  (Sturgeon Dep. 90–91.)  Sturgeon also spoke to Janis Eldridge, a nurse manager on 1 West, about returning to 1 West.  She told

Eldridge that she wanted to work in a flex position, but Eldridge told her that the flex position in 1 West was not available. (Eldridge Dep. 48–49.) Eldridge also told her that because she worked in a different department, she would have to bid on a position in order to transfer to 1 West. (Eldridge Dep. 48–50.)

Ashley Ferguson, a nurse working in 1 West, moved into a vacant RN flex position in 1 West, several months later, on or about September 7, 2008. (Applegate Aff., Doc. 12-2 at 2.) She was given the flex position after she told Eldridge that she would have to quit her job due to a personal situation that required her travel out of town frequently. (Eldridge Dep. 54–55.) The flex position gave Ferguson the ability to take one or two weeks off when necessary. (*Id.*) The flex position in 1 West was vacant before Ferguson transferred into it. (Eldridge Dep. 53–56; Sturgeon Dep. 128–29.) Ferguson was less than forty years old at all times relevant hereto. (Eldridge Dep. 60–61; Sturgeon Dep. 62.)

On April 27 and April 30, 2008, Sturgeon bid on two separate admission review specialist positions, both of which required only an LPN certification and paid less than an RN position. Also on April 30, 2008, Sturgeon applied for an RN position with hospice. The job vacancy posting later was withdrawn.

On May 7, 2008, Sturgeon submitted a late bid for an RN position in pediatrics. Sturgeon admitted that she could not dispute "for sure" that her bid had been timely. (Sturgeon Dep. 95.) On May 8, 2008, Sturgeon submitted late bids for RN positions on 3 North A and 3 North B. Sturgeon did not dispute at her deposition that her bids were untimely. (*Id.* at 95.) The pediatrics RN position and the RN positions on 3 North A and 3 North B were what SOMC refers to as "overhire" positions.

7

"Overhire" positions are temporary jobs created to recruit new graduates from nursing schools who are not yet certified to perform all nursing duties, such as the administration of medication. They are not regularly budgeted positions and they are abolished when the nurse moves into a regular position. SOMC asserts that the market for new nurse graduates in Southern Ohio and Northeast Kentucky is very competitive. SOMC uses overhire positions to attract new graduates. Sturgeon denies these facts regarding overhire positions, but the deposition excerpts she relies on do not provide factual support for her denials. Instead, the evidence indicates only that, during the relevant timeframe, SOMC posted the overhire positions as regular positions. That is, Sturgeon and other applicants could not determine from the job posting that the position was an overhire position. (Walburn Dep. 62–65; Preston 24–27, 30–31; Warrick Dep. 14–16; Ross Dep. 49–50.)[2]

## D.    End of Employment

On April 29, 2008, a meeting was held between Greene, the director of surgical services; Klaiber, Sturgeon's direct supervisor; Ken Applegate, SOMC's human resources director; and Karen Walburn, SOMC's recruiting manager. The group members were concerned about two issues. They questioned whether SOMC should continue to expend resources to train Sturgeon in the surgery orientation when she had resigned. (Applegate Dep. 27; Walburn Dep. 29.) Also, the group members had heard conflicting stories regarding whether Sturgeon wanted to rescind her resignation and whether Sturgeon had told people that Claudia Burchett, the vice president of patient services at SOMC, had promised to find her a flex or contingent position. (Klaiber Dep.

_____

[2] Due to the confusion this past practice caused, SOMC now posts the positions as "nurse associate" positions. (Walburn Dep. 64–65; Warrick Dep. 14–16.)

85–88 & Exs. 8–18; Applegate Dep. at 27, 29–30; Walburn Dep. 20–21, 29.) This group recommended to Burchett that Sturgeon be paid for the remainder of her resignation notice period without reporting to work. (Klaiber Dep. 85–88; Applegate Dep. at 27, 29–30; Walburn Dep. 29.)

On or in the days immediately preceding May 2, 2011, Sturgeon spoke to Burchett. Sturgeon explained that she still was pursuing positions at SOMC and Burchett responded, in essence, that she would look into the situation. (Sturgeon Dep. 96–97; Burchett Dep. 25–29.) Burchett contacted several nurse managers regarding Sturgeon. The consensus of the managers was that Sturgeon created turmoil, or stirred the pot, by not "letting go" of issues after they had been resolved. (Burchett Dep. 16–20.)

On May 4, 2008, Burchett telephoned Sturgeon at home. During this conversation, Burchett told Sturgeon the results of her inquires with the nurse managers and informed her that she would be paid for the days remaining in her resignation notification period without working. Sturgeon asked if she was being fired. Burchett said that she was not fired.

On May 8, 2008, Burchett recommended that Preston not forward Sturgeon's application for the three overhire positions to the respective hiring managers. (Klaiber Dep. Ex. 22; Walburn Dep. 62–63.)

On May 10, 2008, Sturgeon's termination took effect. Sturgeon did not apply for any additional positions at SOMC after that date. Sturgeon's former position in the Surgery Department remained vacant for the remainder of 2008. In December 2008 it was converted to a surgical technician I classification. This position was filled by Robert Lemons in February 2009. Surgical RNs and Surgical Technicians perform different duties. Surgical technicians work

under the supervision of surgical RNs and serve as their assistants.  Surgical RNs assess, plan,
implement, evaluate and supervise patient care in operating rooms.  Sturgeon was paid $30.04
per hour at the time of her resignation.  Lemons' starting pay rate as a Surgical Technician I was
$13.40 per hour.

**E.  Additional Facts Related to FMLA and Disability Claims**

Sturgeon testified in her deposition that her personal disability claim was based on the
medical conditions of hypertension and arthritis.  (Sturgeon Dep. 106–07.)  Sturgeon's
hypertension went away after several months. The effect of Sturgeon's arthritis was that she
could no longer lift 50 or 100 pounds by herself.  She remained physically capable of performing
any job at SOMC.  (*Id.* at 107, 148.)  Sturgeon asserted in her briefs that SOMC regarded her as
disabled.

On April 10, 2008, Sturgeon had informed Greene and Klaiber that she would need to
request medical leave for her husband's then-upcoming surgery.  (*Id.* at 49–53.)  However, she
ceased working at SOMC before she needed to take the leave.  (*Id.*)  Sturgeon concedes that no
one at SOMC commented negatively about her age, her use of FMLA leave, her medical
condition, or her husband's medical condition.

**F.  Procedural History of the Case**

Sturgeon filed this suit against SOMC on May 19, 2010.  (Doc. 1.)  She asserts seven
claims for relief:

I.   Age discrimination under the Age Discrimination in Employment Act
     ("ADEA"), 29 U.S.C. § 621, *et seq.*;
II.  Age discrimination under the Ohio Revised Code ("O.R.C.") chapter
     4112;
III. Interference/Retaliation under the FMLA, 29 U.S.C. § 2601, *et seq.*;
IV.  Associational disability discrimination under the Americans with

        Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*;

  V.     Associational disability discrimination under O.R.C. chapter 4112;

  VI.    Disability discrimination under the ADA; and

  VII.   Disability discrimination under O.R.C. chapter 4112.

(*Id.*)

SOMC now moves for summary judgment on all claims. The pending motion has been fully briefed and is ripe for consideration.

## II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find

for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

## A. Age Discrimination Claims

Sturgeon alleges that she was discriminated against in violation of federal and Ohio law because she was over forty years of age. The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Ohio law parallels the ADEA and the Court will analyze the state and federal age discrimination claims together. *See Ercegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344, 357–58 (6th Cir. 1998) (on claims arising under O.R.C. § 4112.014); *Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F. Supp. 2d 787, 792 (S.D. Ohio 2002) (on claims arising under O.R.C. § 4112.02.).[3]

Sturgeon lacks direct evidence of age discrimination, so the Court will analyze her claim based on indirect evidence pursuant to the *McDonnell Douglas* framework. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). A plaintiff establishes a prima facie case of age discrimination with evidence that (1) she was a member of a protected age class; (2) she suffered an adverse employment action; (3) she was qualified for the position she held or sought; and (4) she was replaced by a younger worker or was treated differently than similarly situated younger employees. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006); *Cichewicz v. UNOVA Indus. Auto. Sys., Inc.*, No. 02-1831, 2004 WL 291178, at *2 (6th Cir. Feb.

---

[3] The Court was unable to discern on what provision Sturgeon bases her Ohio law claim.

12, 2004). If the plaintiff establishes her prima facie case, the burden of production switches to the employer to provide a legitimate, nondiscriminatory reason for the action taken. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987); *see also Holl v. Potter*, No. 1:09-cv-618, 2011 WL 4337041, at *14 (S.D. Ohio June 6, 2011), *report and recommendations adopted by*, 2011 WL 4337038 (S.D. Ohio Sept. 15, 2011). The plaintiff then has the burden to establish that the employer's proffered reason is a pretext for discrimination. *Holl*, 2011 WL 4337041, at *14 (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)).

To begin analyzing Sturgeon's prima facie case, it is undisputed that Sturgeon was over the age of forty and objectively qualified in terms of education and experience for the RN surgery position. Therefore, Sturgeon has established the first and second prongs of her prima facie case. Additionally, SOMC does not dispute that it filled every transfer position to which Sturgeon applied, except for one, with employees under the age of forty.[4] (Doc. 30-2 at 2.) Sturgeon's claims begin to crumble, however, at the adverse employment action prong.

The Sixth Circuit defines an adverse employment action as a "materially adverse change in the terms and conditions of her employment because of her employer's conduct." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Adverse employment actions are typically characterized by "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).

---

[4] It is irrelevant whether SOMC replaced Sturgeon with a younger employee in her Surgery Department position because she had resigned voluntarily.

13

The change in employment must be objectively and materially adverse to constitute an adverse employment action. *Cf. Kocsis*, 97 F.3d at 885–86.

A voluntary resignation would not constitute an adverse employment action taken by an employer against an employee, but an involuntary termination of employment would.[5] Sturgeon argues there is at least a question of fact whether she resigned from SOMC. Sturgeon contends that she only resigned from her surgery position and she intended to transfer to another position at SOMC. She contends that she was required to submit a resignation letter before she could transfer positions. However, the objective facts demonstrate that Sturgeon was not required to submit a resignation letter in order to apply for a transfer position. Her own job history belies that contention. In mid-2007, Sturgeon did not resign her position in 1 West until after she had received the offer to transfer to the surgical position. In February 2008, Sturgeon applied for a position outside of the Surgery Department without resigning. Also, multiple management-level SOMC employees testified that SOMC did not require an employee to resign their current position before seeking a transfer. (Klaiber Dep. 33; Preston Dep. 16; Cooper Dep. 27–29.)

Sturgeon also points to emails to and from various management employees as evidence that SOMC knew she did not want to end her employment at SOMC altogether. (Klaiber Dep. Exs. 8–18.) The emails suggest that the managers knew that Sturgeon preferred to transfer to another position at SOMC rather than resign. For example, Jerry Klaiber, Sturgeon's supervisor, understood that Sturgeon wanted to find another position within SOMC, but that she would resign if necessary. (*Id.* at 36–38 & Ex. 6.) Klaiber wrote in an email: "I have an employee . . .

---

[5] The Court notes that Sturgeon presented no facts and made no arguments that her resignation constituted a constructive discharge. *See Kocsis*, 97 F.3d at 887.

14

[who] wants to leave the department. . . .  She expressed that she would be willing to quite [*sic*] altogether if need be." (*Id.* Ex. 6.)  Tom Greene stated in an April 25, 2008 email that he understood that there were no openings to which Sturgeon could transfer. (*Id.* Ex. 9.)  The emails also mentioned a rumor that Sturgeon might have wanted to rescind her resignation. (*Id.* Exs. 6, 8–18.)  However, Sturgeon did not, in fact, rescind her resignation.  She did not want to continue working in the Surgery Department in the sole position at SOMC in which she was employed.  Sturgeon provides no basis for the Court to conclude that SOMC had a legal obligation to disregard her voluntary resignation and continue her employment.  In conclusion, Sturgeon's voluntary resignation from SOMC did not qualify as an adverse employment action.

Relatedly, Sturgeon asserts that the failure of SOMC to transfer her to another position within the medical center constituted an adverse action.  In the Sixth Circuit, a claim based on an employee's request to transfer to a new position within the same employer organization must be analyzed as a "failure to promote," rather than a failure to hire.  *Freeman v. Potter*, 200 F. App'x 439, 443 and n.1 (6th Cir. 2006).  The failure to promote an employee constitutes an adverse employment action.  *Burlington Inds., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  However, the denial of a lateral transfer is not an adverse employment action unless it results in a material change of salary, benefits, responsibilities, or prestige.  *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007); *Moore v. City of Columbus*, 129 F. App'x 978, 981 (6th Cir. 2005).  "[A] plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004); *see also Tolliver v. Children's Home-Chambliss Shelter*, 784 F. Supp. 2d 893, 903 (E.D. Tenn. 2011) (same).

15

The Court, therefore, must determine whether the denial of any of the positions to which Sturgeon applied constituted an adverse action.  First, the denial of the patient representative position and the two separate admission review specialist positions did not constitute adverse actions.  Each of these positions required a lesser LPN certification and paid a lower salary, and therefore, could not have constituted a promotion.  Second, the flex positions for which Sturgeon applied or expressed interest would have required her to work on an "as needed" basis at a slightly higher salary, but with no benefits.  These facts suggest that the flex position were lateral transfers from regular, full-time positions.  As to the remaining positions, Sturgeon has not established with facts that these positions would resulted in a material increase in salary, benefits, responsibility, or prestige so as to constitute promotions.  For example, Sturgeon has not identified any facts in the record establishing the salary or responsibilities of the breast health navigator, workforce development educator, RN on 1 West position, RN in pediatrics position, or RN in 3 North A and 3 North B positions.  Accordingly, Sturgeon has not met her burden to establish that the denial of these positions constituted denials of promotions and, therefore, adverse actions.

Even if Sturgeon could establish a prima facie case of age discrimination, SOMC has articulated legitimate non-discriminatory reasons, with one exception, for its decision to hire other applicants for the transfer positions.  Sturgeon has not met her burden of establishing that the SOMC's justifications were pretext for age discrimination.  The RN flex position in the Emergency Department was filled by a nurse already in the department who had priority over Sturgeon for the position.  The breast health navigator position was filled by a timely bidder who received preference in hiring.  The workforce development educator position was awarded to an

16

outside candidate with a higher degree in education.

The three overhire RN positions for which Sturgeon applied were temporary positions created by SOMC for the purpose of hiring new nursing school graduates. Employers are permitted to rely on reasonable facts other than age in their hiring decisions, even if a disparate impact on older workers results. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 238–39 (2005). Although SOMC's policy of posting those overhire positions as regular positions caused confusion, SOMC has established that the overhire positions, in fact, were reserved for recent nursing graduates. Sturgeon has not rebutted SOMC's evidence on this point.

Sturgeon was a late bid on the RN position in 1 West position. The supervisor in 1 West admitted in her deposition that Sturgeon was a good, qualified nurse. However, she thought that Sturgeon gossiped and complained about the work schedule too much. (Eldridge Dep.) Sturgeon has provided no objective reason to conclude that this supervisor's admitted bias against Sturgeon was pretext for discrimination on the basis of age or other protected factor.

Finally, Sturgeon was a late bid on the RN position in pediatrics for which she applied on April 18, 2008. It is not clear from the record why SOMC hired a different candidate for the RN position in pediatrics, though SOMC had a policy of giving preference to on-time bidders. This is the one instance in which SOMC has not articulated clearly a non-discriminatory reason for its decision. However, as explained earlier, Sturgeon has not established that the pediatrics RN position constituted a promotion. The failure to reward Sturgeon the position was not an adverse action.

In a different vein, Sturgeon asserts that she was treated less favorably than a younger nurse, Ashley Ferguson, who was permitted to transfer into a flex position within her own

17

department after she informed her supervisor that she might have to quit her position. Sturgeon asserts that she should have been permitted to transfer into a flex position as well. However, Sturgeon's argument is flawed in that she was not similarly situated to Ferguson in all relevant respects. Sturgeon and Ferguson worked in different departments at SOMC and had different supervisors. Sturgeon was not eligible for a flex position in the Surgery Department until she had completed her orientation. Sturgeon has not provided evidence that there was a vacant flex position in the Surgery Department in April or May 2008 when she resigned. By contrast, SOMC's evidence is undisputed that there was a vacant flex RN position in 1 West in September 2008 which Ferguson then filled.

Additionally, Sturgeon resigned her position in the Surgery Department because she no longer wished to work there. Sturgeon suggests that SOMC was required to disregard her resignation and create a flex position for her in the very department from which she was quitting until such time as she could obtain a transfer. Ferguson, on the other hand, did not seek to transfer from the department in which she was then employed. She needed a flexible schedule only to permit her to travel to address a personal situation. Transferring Ferguson to the flex position within 1 West enabled SOMC to retain her employment at SOMC and within her own department. This is a material distinction.

In sum, SOMC is entitled to judgment as a matter of law on the age discrimination claims. Sturgeon has not demonstrated that a material dispute of fact exists as to whether, in fact, she voluntarily resigned her employment from the hospital. Moreover, Sturgeon has not submitted sufficient evidence upon which a jury could conclude that she suffered an adverse action as to the transfer positions because the transfers sought would not have constituted

18

promotions. This is an independent basis to grant summary judgment to Sturgeon on these claims. Finally, with the exception of the non-overhire RN position in pediatrics, Sturgeon has not demonstrated that a material dispute of fact exists as to whether SOMC's stated reasons for its transfer position hiring decisions were pretextual.

**B.      FMLA Claim**

Sturgeon alleges in this claim that SOMC interfered with her exercise of FMLA rights or retaliated against her for exercising her FMLA rights. The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA or "to discharge or in any other manner discriminate against any individual for opposing a practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a).

In order to establish a *prima facie* case of retaliation for FMLA leave or planned FMLA leave, the plaintiff must show that: (1) she availed herself of a protected right under FMLA by taking leave or giving her employer notice of intent to take leave; (2) the employer made an adverse employment decision which negatively impacted the plaintiff; and (3) there is a causal connection between the exercise of protected FMLA rights and the adverse employment action, which can be evidenced by a mere showing of close proximity in time between the exercise of the protected right and the adverse employment action. *Skrjanc v. Great Lakes Power Serv., Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

Although Sturgeon has presented evidence that she had taken FMLA leave in the past and had notified her supervisors of her intention to take future FMLA to care for her husband, she has not established that SOMC took an adverse action to retaliate against her or interfere with her use of FMLA benefits. Primarily, Sturgeon has not demonstrated a genuine issue of

19

disputed material fact regarding whether she resigned from SOMC.  SOMC is not required to

retain an employee who has voluntarily submitted, and not rescinded, a letter of resignation.

Sturgeon's resignation did not constitute an adverse employment action.  Likewise, because

Sturgeon voluntarily resigned, SOMC as a matter of law did not terminate her employment to

interfere with her right to take FMLA leave to care for her husband.  Finally, Sturgeon also has

not demonstrated a genuine issue of material fact that the denials of the transfer positions to

which she applied constituted actionable denials of a promotion.

      For these reasons, SOMC is entitled to summary judgment on Sturgeon's FMLA claim.

**C.**      **Disability Claims**

      Sturgeon lastly alleges that she was discriminated against because SOMC perceived her

to be disabled and because of her husband's disability.  She has no direct evidence of

discrimination.  A plaintiff establishes a prima facie case of disability discrimination with

indirect evidence by proving that: (1) she is disabled; (2) she is otherwise qualified for her

position; (3) she suffered an adverse employment action; (4) the employer knew or had reason to

know of her disability; and (5) similarly situated employees outside of the protected class were

treated better, or the plaintiff's position was filled by someone outside of the protected class.  *See*

*Scott v. FirstMerit Corp.*, 167 F. App'x 480, 487 (6th Cir. 2006); *Hopkins v. Elec. Data Sys.*

*Corp.*, 196 F.3d 655, 660 (6th Cir. 1999); *see also Columbus Civ. Serv. Comm'n v. McGlone*, 82

Ohio St. 3d 569, 573, 697 N.E.2d 204 (1998) (stating that federal law cases apply to Ohio law

disability claims).  Being disabled for purposes of the first prong of the prima facie claims

includes being regarded as having a physical or mental impairment that substantially limits one

or more of a person's major life activities.  42 U.S.C. §12102(2) (version effective prior to

January 1, 2009 amendments).

An associational discrimination claim arises when an individual is discriminated against because "of the known disability of [another person] with whom the . . . individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4) (version effective prior to January 1, 2009 amendments).  A plaintiff establishes a prima facie case of associational disability under federal law by proving that "(1) she was qualified for the position; (2) she was subject to an adverse employment action; (3) she was known to have a relative with a disability; and (4) the adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision."  *Overly v. Covenant Transport, Inc.*, 178 F. App'x 488, 493 (6th Cir. 2006).  The Sixth Circuit recently emphasized that the plaintiff "must offer some evidence to suggest that the adverse employment action he or she suffered was due in some measure to discriminatory animus."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 488 (6th Cir. 2011).  There is no associational disability claim under Ohio law.  *Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 830–31 (6th Cir. 2002).

These claims too, like the age discrimination and FMLA claims, fail as a matter of law. Preliminarily, Sturgeon's purported evidence that SOMC regarded her as disabled are the facts that she had requested FMLA leave in the past, she had informed her supervisors that she had high blood pressure, and she had voiced concerns over the hours required for the surgical RN position.  (Sturgeon Dep. 28, 30, 40–50, 64–65.)  This purported evidence is insufficient as a matter of law.  The fact that an employee has taken FMLA leave or that an employer is aware that an employee has a health condition does not meet the threshold of establishing that the employer perceives the employee to be substantially limited in a major life activity.  *See* 42

21

U.S.C. §12102(2).  Likewise, Sturgeon has not identified any specific evidence which raises a

reasonable inference that SOMC harbored discriminatory animus towards her based on her

husband's disability.[6]  Finally, for the reasons stated above as to the age discrimination and

FMLA claims, SOMC did not subject Sturgeon to an adverse employment action.  The Court

will grant summary judgment to SOMC on both the personal disability and associational

disability claims.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 12) hereby

is **GRANTED**.

IT IS SO ORDERED.


___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

---

[6] In the Motion for Summary Judgment, SOMC asserted that Sturgeon failed to present evidence that "an adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of her husband was a determining factor in the decision." (Doc. 12-1 at 16.)  Sturgeon then incorrectly stated in her Memorandum in Opposition that "SOMC disputes only the adverse action prong of the *prima facie* case."  (Doc. 30 at 24.) Sturgeon failed to even attempt to prove SOMC took an alleged adverse action against her based in part on a discriminatory animus.

22